SNOW JENSEN & REECE, P.C.
J. Gregory Hardman (Utah Bar No. 8200)
Jeffrey R. Miles (Utah Bar No. 14258)
J. Tyler King (Utah Bar No. 18035)
Tonaquint Business Park
912 West 1600 South, Suite B-200
St. George, UT 84771-2747
Telephone: (435) 628-3688
Facsimile: (435) 628-3275
ghardman@snowjensen.com
jmiles@snowjensen.com
tking@snowjensen.com

*Attorneys for Plaintiff United Energy Workers Healthcare, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED ENERGY WORKERS HEALTHCARE, LLC, an Ohio limited liability company; | **COMPLAINT** |
| Plaintiff, | |
| v. | Civil No. 2:24-cv-00318 |
| NATALIE CAVALLARO, an individual; NUCLEAR WORKER SOLUTIONS, LLC, a New Mexico limited liability company; JANE AND JOHN DOES 1-10; and DOE BUSINESS ENTITIES 1-10; | |
| Defendants. | |

## COMPLAINT

Plaintiff United Energy Workers Healthcare, LLC, by and through its counsel of record, J. Gregory Hardman, Jeffrey R. Miles, J. Tyler King, and Snow Jensen & Reece, P.C., hereby complains against Defendants Natalie Cavallaro, Nuclear Worker Solutions, LLC, Jane and John Does 1-10, and Doe Business Entities 1-10 and alleges as follows:

## PARTIES

1.      Plaintiff United Energy Workers Healthcare, LLC ("UEW") is an Ohio limited liability company with headquarters in Fremont County, Wyoming. UEW was formerly known as "United Energy Workers Healthcare Corp."

2.      UEW's sole member is UEW Holdings, LLC (a Delaware limited liability company);  UEW Holdings, LLC's sole member is UEW Acquisition, LLC (a Delaware limited liability company); UEW Acquisition, LLC's sole member is UEW Intermediate Holdings, LLC (a Delaware limited liability company); UEW Intermediate Holdings, LLC's sole member is LEP UEW Holdings, LLC (a Delaware limited liability company); and LEP UEW Holdings, LLC's members are various co-investors, Leavitt Equity Partners, Black Mountain Holding Group Corporation (a Delaware corporation), and Four Corners WY Holdings, Inc. (a Wyoming corporation).

3.      Defendant Natalie Cavallaro ("Cavallaro") is an individual who, upon information and belief, resides and is domiciled in Salt Lake County, Utah.

4.      Defendant Nuclear Worker Solutions, LLC ("NWS") is a limited liability company that is organized under New Mexico law and has its principal place of business in Bernalillo County, New Mexico or Salt Lake County, Utah.

5.      Upon information and belief, UEW alleges that Cavallaro is a managing member, founder, and employee of NWS. Currently, and despite a reasonable investigation, UEW does not have complete information about all the members of NWS.

6.      Defendants Jane and John Does 1-10 and Doe Business Entities 1-10, on information and belief, are businesses, persons, partners, agents, or associates of Defendants who participated in the acts hereafter alleged, and who later may be specifically identified as parties herein.

## JURISDICTION AND VENUE

7.      This is a civil action for violation of the Federal Defend Trade Secrets Act (18 U.S.C. §§ 1836 *et seq.*), breach of contract, unjust enrichment, and interference with business expectancies.

8.      This Court has original jurisdiction over the federal trade secret claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because the misappropriated trade secrets were related to a product or service used in, or intended for use in, interstate commerce.

9.      Further, the state law claims asserted herein are so related to those claims over which this Court has original jurisdiction as to form part of the same case or controversy. This Court therefore has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the related state law claims asserted herein.

10.     Cavallaro is subject to both general and specific personal jurisdiction in this judicial district because she is domiciled within this judicial district and the underlying wrongful conduct, including trade secret misappropriations, interference with business expectancies, and other related

claims occurred in this judicial district and arise out of actions by Cavallaro creating a substantial connection with this forum.

11.    NWS is subject to both general and specific personal jurisdiction in this judicial district because its managing member, Cavallaro, is domiciled in Utah, its principal place of business is in Utah (as well as New Mexico), the State of contracting was the State of Utah (although the subject employment agreement is governed by Wyoming law), and because the underlying wrongful conduct, including trade secret misappropriations, and other related claims occurred in this judicial district and arise out of actions by Cavallaro and NWS creating a substantial connection with this forum.

12.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1)–(2) because many of the acts and events on which the claims are based occurred in this judicial district and Cavallaro resides within and operates NWS from this judicial district.

## BACKGROUND

13.    UEW is in the business of providing home health care to beneficiaries of the Energy Employees Occupational Illness Compensation Program Act ("EEOICPA") and the Radiation Exposure Compensation Act ("RECA").  EEOICPA and RECA are administered by the U.S. Department of Labor, and UEW is a registered provider of home health care services.

14.    The EEOICPA was enacted in October 2000.  Part B of the EEOICPA, effective on July 31, 2001, compensates current or former employees (or their survivors) of the U.S. Department of Energy, its predecessor agencies, and certain of its vendors, contractors and subcontractors, who were diagnosed with a radiogenic cancer, chronic beryllium diseases, beryllium sensitivity, or chronic silicosis, as a result of exposure to radiation, beryllium, or silica

while employed at covered facilities.  The EEOICPA also provides compensation to individuals (or their eligible survivors) awarded benefits by the Department of Justice under Section 5 of RECA.  Part E of the EEOICPA, enacted October 28, 2004, compensates U.S. Department of Energy contractor and subcontractor employees, eligible survivors of such employees, and uranium miners, millers, and ore transporters as defined by RECA Section 5, for any occupational illnesses that are causally linked to toxic exposures in the U.S. Department of Energy or mining work environment.

15.     Implementation of the EEOICPA involves the coordinated efforts of four federal agencies: the U.S. Department of Labor, the U.S. Department of Energy, the U.S. Department of Justice, and the U.S. Department of Health and Human Services. The U.S. Department of Labor has primary responsibility for administering the EEOICPA, including adjudication of claims for compensation and payment of benefits for conditions covered by Parts B and E.

16.     Successful home health care companies serving eligible EEOICPA and RECA beneficiaries must expend substantial upfront sums of money and amounts of time to locate and qualify patients. Marketing efforts include mass mailings, direct mailings, maintenance of an online website, and door-to-door contacting in communities thought to have substantial concentrations of potential beneficiaries.

17.     Furthermore, potential EEOICPA and RECA beneficiaries must be qualified for eligibility by the U.S. Department of Labor. Among other criteria, a home health care agency seeking to qualify the potential beneficiary (patient) must arrange for the person to receive a medical screening exam from a licensed medical doctor and hire a nurse to prepare a plan of care report.  The physician's exam results and plan of care report are then submitted by the home health

care agency to the U.S. Department of Labor. If the potential beneficiary (patient) is deemed eligible for medical service benefits, the U.S. Department of Labor issues an authorization letter, and the home health care agency may thereafter begin providing a particular compliment of medical care services by contracting with licensed medical care providers (i.e., registered nurses, certified nurse assistants, physician assistants, therapists, home health aides, etc.) at privately agreed-upon rates.

18.    Providing home health care to beneficiaries of EEOICPA and RECA is highly competitive. Thus, any information known to a business in this field that is not readily ascertainable gives an advantage to acquiring or generating patients and is very valuable.

19.    UEW was organized and began providing home health care services to beneficiaries of the EEOICPA and RECA in or about June 2011.

20.    UEW, which now operates in approximately twenty-five states, along with its sister company, Four Corners Healthcare, LLC, were among the first home health care agencies providing services to patients under the EEOICPA and are among the largest such businesses operating in the nation.  Consequently, the generation of patient lists for UEW constitutes unique proprietary and confidential information.

21.    UEW's proprietary, confidential information and trade secrets are extremely valuable to UEW.

22.    UEW has taken great care to protect and maintain the secrecy of its confidential and proprietary information, including by, among other things, requiring all employees and other business associates to enter into confidentiality, non-disclosure, and non-solicitation agreements, protecting access to company systems by requiring passwords for access and regularly monitoring

such access, and limiting access to confidential information and company systems to select trusted persons within UEW.

23.    UEW has invested large amounts of time and resources, including millions of dollars, into developing its proprietary systems and methods for developing patients, which include valuable proprietary confidential information and trade secrets, including, without limitation, market demographics research; proprietary empirical trial and error data/information developed through experimentation and fine tuning of patient generation systems; business, customer, medical care provider, and vendor information and relationships; and other proprietary, confidential information and trade secrets, which are not publicly available or readily ascertainable by the public.

24.    UEW's proprietary confidential information and trade secrets provide it with a tremendous advantage over competitors with respect to its ability to generate large numbers of high-quality patients.

25.    In the early years of its business operations, the founders of UEW personally secured many of the company's patients through direct door-to-door contacts, living for extended periods of time on the road.

26.    Continuing to this date, identifying, recruiting, and getting new patients qualified for services is a time and labor-intensive project.

## GENERAL ALLEGATIONS

### Cavallaro's Employment Agreement with UEW

27.     UEW originally hired Cavallaro on or about July 11, 2017. She was primarily responsible for managing herself and others to locate individuals who could be qualified as beneficiaries of the EEOICPA and receive home health care services from UEW.

28.     On or about May 10, 2019, Cavallaro was promoted to the position of Marketing Manager and Director of Marketing, a supervisory position that entitled her to review and have access to vast quantities of patient records, files, and other confidential information of UEW. In connection with this employment promotion, Cavallaro was assigned to work at UEW's corporate office in Spanish Fork, Utah. A true and correct copy of Cavallaro's May 10, 2019 employment agreement (the "Employment Agreement") is attached hereto as **Exhibit 1** and incorporated herein by reference. At this same time, Cavallaro also signed a Confidentiality, Non-Disclosure, Non-Competition, and Non-Solicitation Agreement, dated May 10, 2019 (the "Non-Compete Agreement"). A true and correct copy of the Non-Compete Agreement is attached hereto as **Exhibit 2** and incorporated herein by reference.

29.     Under paragraph 6 of the Employment Agreement, Cavallaro agreed that her employment promotion was contingent upon her signing and abiding the terms of the Non-Compete Agreement.

30.     Under Section 2 of the Non-Compete Agreement, Cavallaro agreed to specified duties regarding confidentiality and non-disclosure, including, without limitation, that she would "maintain in strict confidence and [would not] use [the Confidential Information], except in the

course of performance of [her] duties for [UEW]." She further agreed that the provisions of Section 2 "survive indefinitely [her] employment with [UEW]."

31.    Under Section 3(a) of the Non-Compete Agreement, Cavallaro agreed that while she was employed by UEW "and for a period of twelve (12) months following the last day of [her] affiliation with [UEW] (the 'Restricted Period'), [she] . . . [would not] engage in, or have a financial interest in, any person, business, or entity which is directly or indirectly 'Competitive' . . . with [UEW]."

32.    Under Section 3(b) of the Non-Compete Agreement, Cavallaro agreed that while she was employed by UEW "and during the Restrictive Period, [she would] not . . . solicit, divert or appropriate or attempt to solicit, divert or appropriate, for the purpose of 'Competing' . . . [with UEW] any customers, clients, patients, or vendors of [UEW] . . . (i) which conducted business with or received services from [UEW] and any time during [her] employment with [UEW], or (ii) with whom [she] had contact or to whom [she] provided services during [her] employment with [UEW]."

33.    Under Section 3(c) of the Non-Compete Agreement, Cavallaro agreed that while she was employed by UEW "and during the Restrictive Period, [she would] not  . . . hire, retain, entice, solicit or encourage any employee, consultant, contractor, or temporary worker to leave [UEW], . . . nor [would she] . . . be involved in the hiring, retaining or recruitment of any employee, consultant, contractor, or temporary work of [UEW]." She further agreed that she was prohibited from doing any of these things "both while such person in an employee, consultant, contractor, or temporary worker of [UEW] . . . and for twelve (12) months after such person's employment, contract service or consultancy terminates."

34.    Under Section 3(e) of the Non-Compete Agreement, Cavallaro further agreed "that the obligations of Section 3(a)–(c) shall be extended by the duration of any violation by [her] of any of the covenants or obligations contained in Section 3(a)–(c), so that in any event, [she] shall have refrained from engaging in the activities prohibited by Section 3(a)–(c) hereof for not less than the periods of time contemplated by Sections 3(a)–(c)."

35.    Under Section 4(a) of the Non-Compete Agreement, Cavallaro agreed that "(a) [u]pon the termination of [her] affiliation with [UEW] for any reason or for not reason . . . [she would] return to [UEW] all tangible and/or electronic Confidential Information in [her] possession, custody or control, and all copied thereof (regardless of how such Confidential Information or copied are maintained), and (b) [she would] deliver to [UEW] any property of [UEW] which may be in [her] possession, custody, or control, including, bit not limited to, notes, notebooks, memoranda, reports, lists, records, specifications, software programs, data, graphics, computers, equipment, models, tools, cellular telephones, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of the business of [UEW] or concerning any of its dealing or affairs and any other [UEW] property in [her] possession, custody or control (whether prepared by [her] or others." She further agreed that the "terms of this Section 4 shall survive indefinitely any termination of [her] affiliation with [UEW] for any reason or for no reason."

36.    Under Section 7(l) of the Non-Compete Agreement, Cavallaro "expressly acknowledge[d] that any breach or threatened breach of any of the terms and/or conditions set forth in Sections 2, 3, or 4 of [the Non-Compete Agreement]" would entitle UEW

to "injunctive or other equitable relief. . . . and to recover from [Cavallaro UEW's] reasonable attorney's fees, together with such other costs and reasonable expenses incurred in connection with such litigation."

### Cavallaro's Unlawful Acts

37.    During her affiliation with UEW, Cavallaro had access to UEW's Confidential Information (as defined in the Non-Compete Agreement), including but not limited to client files and patient lists.

38.     During her affiliation with UEW, Cavallaro downloaded patient lists on multiple occasions, including shortly before she ended her association.

39.    During her affiliation with UEW, Cavallaro had access to a Master Patient Census (a comprehensive list of all the patients) and client files related to her position.

40.    Pursuant to the aforementioned sections of the Non-Compete Agreement, Cavallaro was contractually prohibited, both during and after her affiliation with UEW, from retaining any patient records, patient lists, or other confidential information without UEW's written consent.

41.    On or about December 30, 2020, while Cavallaro was still employed by UEW, organized NWS in the State of New Mexico for the express purpose of competing with UEW.

42.    At or about this same time, Cavallaro induced Jason Sanchez, who was then also employed by UEW as Chief Operations Officer, to join with her in organizing NWS for the express purposed of competing with UEW.

43.    NWS was organized to be a direct competitor of UEW, operating in the same geographic locations, and is materially engaged in providing home health care services to

individuals who receive benefits under the EEOICPA and RECA in direct violation of the Employment Agreement the Non-Compete Agreement.

44.     These actions by Cavallaro in organizing NWS to be a competitor or UEW and inducing Jason Sanchez to join her in doing so violated the provisions of the Non-Compete Agreement.

45.     Cavallaro resigned her employment with UEW on June 30, 2021.

46.     When resigning her employment with UEW, Cavallaro erased all data and factory settings on her UEW laptop computer before delivering it to UEW.

47.     Soon thereafter, Cavallaro solicited and induced Jeremy Arndt to work for NWS.

48.     Jeremy Arndt was formerly employed by UEW, and while so employed he worked directly under Cavallaro's supervision and direction as a patient recruiter.

49.     Jeremy Arndt resigned his employment at UEW on or about March 1, 2021.

50.     Upon information and belief, some months later Cavallaro arranged for Jeremy Arndt to work for NWS in late-2021, initially in the state of Michigan.

51.     Upon further information and belief, beginning in or about December 2021 and continuing through January 2023, Cavallaro and NWS employed Jeremy Arndt to recruit patients for NWS in the state of Ohio, which is where UEW is organized and has a substantial base of operations.

52.     Cavallaro had regular practice of sending "knock lists" to Jeremy Arndt via email accounts associated with NWS, which lists contained biographical and other information about potential patients, including, among other details which home health care company was proving services to the potential NWS patients.

53.     Upon information and belief, Cavallaro and NWS were also actively working to recruit patients in the state of Kentucky, which is another state where UEW has a substantial base of operations.

54.     Upon information and belief, Cavallaro and NWS began to solicit and poach UEW's patients as early as January 2022.

55.     These actions by Cavallaro of hiring Jeremy Arndt to recruit patients for NWS and to solicit and poach UEW's patients violated the provisions of the Non-Compete Agreement.

56.     Upon information and belief, throughout 2022 and 2023, Cavallaro and NWS solicited many UEW patients in an effort to get them to switch home health care providers. To date, UEW is aware of two (2) patients who, after being solicited by NWS and Cavallaro, switched providers to NWS.

57.     None of these patients ever complained to UEW about the quality of care they had received from UEW before the date they were poached.

58.     The loss of these patients represents the loss of hundreds of thousands of dollars—and potentially millions of dollars—in annual revenue for UEW.

59.     These patients were solicited by Cavallaro and NWS, which were in possession of the patients' contact information and details through Cavallaro's former employment with UEW.

60.     These patients only could have been contacted in this manner if Cavallaro and NWS were in possession of UEW's confidential information and trade secrets.

61.     NWS continues to aggressively solicit UEW's patients using UEW's confidential information and trade secrets, and UEW has learned of additional direct and indirect solicitations of UEW's patients by Cavallaro or those working under her direction.

## FIRST CLAIM FOR RELIEF
### (Defend Trade Secrets Act Claim ("DTSA") – 18 U.S.C. § 1836 against All Defendants)

62.     UEW incorporates and realleges all other paragraphs of this Complaint as though fully set forth herein.

63.     As set forth above, UEW has various trade secrets critical to the success of its business, including, most notably, a confidential patient list that has been developed over the years to include, or is based upon, unique designs, formulas, information, methods, patterns, processes, techniques, demographic information, and marketing and advertising systems, as well as the compilation of such, all of which constitute "trade secrets" within the meaning of the DTSA, 18 U.S.C. § 1839(3).

64.     UEW's trade secrets are related to its operations as a home health care provider to beneficiaries of the EEOICPA and RECA.

65.     UEW has invested and spent significant amounts of money, effort, energy, resources, and time developing its trade secrets, which derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

66.     UEW has taken steps and made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, requiring contractors, employees, shareholders and members, as the case may be, to enter into written confidentiality, non-disclosure and non-solicitation agreements, limiting the individuals to whom UEW's trade

secrets were disclosed; namely, to include only certain individuals employed or contracted by UEW who had a legitimate need to access the confidential information.

67.    UEW maintains security measures to limit access to its confidential information and trade secrets by requiring password protected login credentials to access computer systems, platforms, and marketing accounts, and only allowing access to sensitive information to a select few people.

68.    Cavallaro was provided access to UEW's trade secrets only after she became employed by UEW and agreed to protect UEW's confidential information.

69.    Cavallaro is under a duty and obligation not to use or disclose those trade secrets.

70.    Upon information and belief, NWS has obtained UEW's patient lists, patient data, and Confidential Information through Cavallaro under circumstances giving rise to a duty to maintain their secrecy.

71.    Cavallaro misappropriated UEW's trade secrets while knowing she was under an obligation not to use or disclose them.

72.    Cavallaro and NWS have used, are using, and inevitably will continue to use UEW's trade secrets without UEW's consent, conduct that has damaged, and will irreparably harm, UEW.

73.    Cavallaro and NWS's misappropriation of UEW's trade secrets was accomplished through improper means including, without limitation, and on information and belief, via unauthorized access to UEW's computer systems, using credentials obtained during Cavallaro's prior employment with UEW, and through improper retention of trade secrets.

74.    Cavallaro and NWS's actions as described herein constitute a misappropriation within the meaning of the DTSA, 18 U.S.C. § 1839(5).

75.    The actions of Cavallaro and NWS have caused and will continue to cause damage to UEW and, unless restrained, will further damage UEW, the nature and extent of which may not be able to be proved with certainty, irreparably injuring UEW, leaving it without a remedy at law.

76.    UEW is entitled to damages as a result of Cavallaro and NWS's misappropriation and/or violations of the DTSA, to the extent UEW's actual losses are calculable.

77.    On information and belief, Cavallaro and NWS's misappropriation of UEW's trade secrets was willful and malicious, entitling UEW to exemplary and/or punitive damages up to two times the amount of damages awarded for UEW's actual loss, damages for unjust enrichment, or the reasonable royalty awarded.

78.    Preliminary and permanent injunctive relief is necessary to prevent irreparable harm and further disclosure of UEW's trade secrets.

79.    UEW is entitled to any unjust enrichment obtained by Cavallaro and NWS's misappropriation of UEW's trade secrets and/or violation of the DTSA.

80.    UEW is therefore entitled to injunctive relief to prevent further use and dissemination of its trade secrets, as well as damages for actual loss caused by misappropriation of trade secrets, damages for unjust enrichment, exemplary damages, and reasonable attorney's fees.

81.    Alternatively, in lieu of damages measured by other methods, pursuant to the DTSA, 18 U.S.C. § 1836(b)(3)(B)(ii), the damages caused by Cavallaro and NWS's misappropriation should be measured by imposition of liability for a reasonable royalty for

Cavallaro and NWS's unauthorized disclosure of or use of each of UEW's trade secrets (i.e., assessment of a royalty for each confidential patient file or record).

## **SECOND CLAIM FOR RELIEF**
### **(Breach of Contract – Cavallaro)**

82.    UEW incorporates and realleges all other paragraphs of this Complaint as though fully set forth herein.

83.    Cavallaro entered into contracts with UEW, namely the Employment Agreement and the Non-Compete Agreement.

84.    Sections 2, 3, and 4 of the Non-Compete Agreement, as described previously, generally prohibit Cavallaro from interfering with UEW's business practices, from disclosing UEW's confidential information and trade secrets, and from soliciting UEW's patients, employees, and independent contractors during her employment and for a period of twelve (12) months after employment with UEW terminated.

85.    Cavallaro, both individually and through NWS, breached the Employment Agreement and the Non-Compete Agreement by interfering with UEW's business practice and by inducing patients to cease to be patients of UEW.

86.    Cavallaro, both individually and through NWS, breached the Employment Agreement and the Non-Compete Agreement by organizing NWS in December 2020 to further her efforts to solicit UEW's patients.

87.    Cavallaro, both individually and through NWS, breached the Employment Agreement and the Non-Compete Agreement by providing services to former patients of UEW in direct violation of the Employment Agreement.

88.      Cavallaro, both individually and through NWS, breached the Employment Agreement and the Non-Compete Agreement by soliciting many UEW patients and successfully poaching at least two UEW patients.

89.      Cavallaro, both individually and through NWS, breached the Employment Agreement and the Non-Compete Agreement, by soliciting many UEW patients and successfully poaching at least two UEW patients through use of UEW's trade secrets and confidential information.

90.      Cavallaro, both individually and through NWS, breached the Employment Agreement and the Non-Compete Agreement by soliciting Jason Sanchez join her company and Jeremy Arndt to work for NWS.

91.      Cavallaro, both individually and through NWS, breached and continues to breach the Employment Agreement and the Non-Compete Agreement by utilizing UEW's confidential information and trade secrets to her own or another's benefit and to the detriment of UEW.

92.      These breaches of the Employment Agreement and the Non-Compete Agreement have caused, and continue to cause, injury to UEW and, if not enjoined, will irreparably harm UEW.

93.      Per the terms of the Employment Agreement and the Non-Compete Agreement, UEW is entitled to an equitable accounting and an award of damages against Cavallaro for breach of contract.

94.      UEW is entitled to an order for injunctive relief, per the terms of the Employment Agreement and the Non-Compete Agreement, prohibiting further use by Cavallaro or related entities of UEW's proprietary and confidential information and trade secrets, and prohibiting

Cavallaro's unfair competition with UEW and solicitation of UEW's employees and patients through use of UEW's confidential and proprietary trade secrets.

95.    UEW is entitled to judgment against Cavallaro for her breaches of the Employment Agreement and the Non-Compete Agreement, in an amount to be proved at trial.

96.    By contract, UEW is entitled to an award of all costs and attorney's fees incurred in the prosecution of its claims against Cavallaro for breach of the Employment Agreement and the Non-Compete Agreement.

## THIRD CLAIM FOR RELIEF
### (Alternative Claim: Unjust Enrichment against All Defendants)

97.    UEW incorporates and realleges all other paragraphs of this Complaint as though fully set forth herein.

98.    Over the course of Cavallaro's employment with UEW, UEW furnished valuable materials—namely, access to UEW's unique and valuable confidential information and trade secrets (patient lists, among other things)—to the party to be charged, Cavallaro.

99.    Cavallaro accepted, used, and enjoyed the materials UEW furnished to her during her employment with UEW, and Cavallaro—individually and through NWS—has retained access to such materials and continues to derive benefits from such materials.

100.    The circumstances under which Cavallaro acquired and retained use of UEW's materials gave rise to an expectation that UEW would expect payment if Cavallaro was to retain such benefits.

101.    Without fair payment for Cavallaro's retention of the benefit of these materials, Cavallaro will be unjustly enriched.

102.    Because (a) Cavallaro promised not to retain UEW's confidential information and trade secrets; because (b) UEW provided access to confidential information, trade secrets, and patients as a result of these promises; and because (c) Cavallaro has been unjustly enriched, this Court should impose a constructive trust upon all pecuniary benefits Cavallaro and her competing company (NWS) have derived through use of UEW's confidential information and trade secrets.

**FOURTH CLAIM FOR RELIEF**
**(Tortious Interference With Business Expectancies against All Defendants)**

103.    UEW incorporates and realleges all other paragraphs of this Complaint as though fully set forth herein.

104.    UEW had valid business expectancies with its patients.

105.    Cavallaro, individually and through NWS, had knowledge of the business expectancies UEW had with its patients, given that Cavallaro had access to UEW's patient list.

106.    Following her resignation from UEW, Cavallaro, individually and through NWS, intentionally and improperly interfered with UEW's business relationships and expectancies with UEW's patients, by soliciting many UEW patients and successfully poaching at least two UEW patients.

107.    UEW has suffered or will suffer resulting damages of hundreds of thousands of dollars, given the disrupted relationships and expectancies.

108.    Given Cavallaro and NWS's past interference with UEW's patients, upon information and belief, UEW alleges that Cavallaro and NWS's interference will harm UEW's existing or prospective relationships with additional patients.

109.    UEW is entitled to damages and injunctive relief as a result of Cavallaro and NWS's conduct.

## PRAYER FOR RELIEF

WHEREFORE, UEW prays for an Order, Judgment, and Injunction as follows:

I.        Judgment finding Cavallaro and NWS liable to UEW, as specified, on each of UEW's alleged claims for relief;

II.        Enjoining each Cavallaro and NWS, and all other persons participating or acting in concert with them, from misappropriating or otherwise using UEW's confidential patient lists and records, including use of UEW's trade secrets, proprietary and confidential information, and derivatives thereof to compete against UEW;

III.        Enjoining Cavallaro and NWS, and all other persons participating or acting in concert with them, from accessing, reproducing, copying, converting, distributing, disseminating, brokering, and/or selling UEW's confidential patient information and trade secrets, proprietary and confidential information, and derivatives thereof;

IV.        Ordering Cavallaro and NWS to surrender to the Court or to UEW all copies of UEW's confidential patient information and trade secrets;

V.        Ordering Cavallaro and NWS to prepare an accounting of all proceeds generated by Cavallaro and NWS through the use of UEW's confidential patient records or other confidential information and trade secrets, including but not limited to the names of all patients historically serviced by Cavallaro and NWS or their related companies, upon the entry of a proper protective order under 45 C.F.R. § 164.512(e)(1), so that a comparison may be made against the legitimate patients of UEW;

VI.        Ordering Cavallaro and NWS to file with this Court and serve on UEW within thirty (30) days after service on Cavallaro and NWS of the injunction granted herein, or such extended

period as the Court may direct, a report in writing, under oath, setting forth in detail the manner and form in which Cavallaro and NWS have complied with the injunction and order of the Court;

VII.     Awarding UEW damages for actual loss caused by the misappropriation of its trade secrets, damages for any unjust enrichment caused by the misappropriation of the trade secrets, and such other damages and awards available, including enhanced damages available under DTSA, 18 U.S.C. § 1836(b)(3) and state laws;

VIII.     Alternatively, in lieu of damages measured by other methods, pursuant to the DTSA, 18 U.S.C. § 1836(b)(3)(B)(ii), awarding UEW's damages caused by Cavallaro and NWS's misappropriation measured by imposition of liability for a reasonable royalty for Cavallaro and NWS's unauthorized disclosure of or use of each of UEW's trade secrets (i.e., assessment of a royalty for each confidential patient file or record);

IX.     Awarding UEW enhanced or double its damages and Cavallaro and NWS's profits as applicable under federal law;

X.     Awarding UEW damages for actual loss caused by such other wrongful conduct of Cavallaro and NWS for which Cavallaro and NWS may be liable, damages for the unjust enrichment caused by such wrongful conduct of Cavallaro and NWS, and exemplary damages for Cavallaro and NWS's willful and malicious actions;

XI.     Imposing a constructive trust in favor of UEW on all proceeds generated by Cavallaro and NWS through the use of UEW's confidential patient information and trade secrets;

XII.     Awarding UEW its attorneys' fees and other costs of bringing this action;

XIII.     Awarding UEW damages for Cavallaro and NWS's unjust enrichment in an amount to be proven at trial;

XIV.     Awarding UEW damages for Cavallaro and NWS's interference with UEW's relationship and business expectancies with patients in an amount to be proven at trial;

XV.      Awarding UEW pre-judgment and post-judgment interest until such awards are paid in full; and

XVI.     Awarding UEW such other and further relief as is just and equitable.

Dated this 3rd day of May, 2024.

SNOW JENSEN & REECE, P.C.

*/s/ Jeffrey R. Miles*
J. Gregory Hardman
Jeffrey R. Miles
J. Tyler King
*Counsel for Plaintiff United Energy Workers*
*Healthcare, LLC*